**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re:

| | |
|---|---|
| FRANKLIN R. JIMINEZ, | Chapter 13 |
| D/B/A J&J CLEANING, | Case No. 98-44741 (JMP) |

                            Debtor.
----------------------------------------------------------------x
FRANKLIN R. JIMINEZ
D/B/A J&J CLEANING,

| | |
|---|---|
| Plaintiff, | Adversary Proceeding No. 04-03149 (JMP) |

   -against-

NYCTL 1996-1 TRUST and
THE BANK OF NEW YORK, AS
COLLATERAL AGENT AND
CUSTODIAN FOR NYCTL 1996-1
TRUST,

                            Defendants.
----------------------------------------------------------------x

**MEMORANDUM DECISION GRANTING JUDGMENT AFTER TRIAL FOR THE DEFENDANTS AND DETERMINING AMOUNT OF SECURED CLAIM**

APPEARANCES:

DAVID O'CONNER, ESQ.
1539 Front Street
Scotch Plains, New Jersey 07076

    David O'Conner, Esq.
    Counsel for Plaintiff Franklin R. Jiminez,

OCHS & GOLDBERG, LLP
60 East 42nd Street, Suite 1545
New York, New York 10165

    Martin P. Ochs, Esq.
    Counsel for Defendants NYCTL 1996-1 Trust and The Bank of New York, as
    collateral agent and custodian for NYCTL 1996-1 Trust

JEFFREY L. SAPIR
399 Knollwood Road, Suite 102
White Plains, New York 10603

>   Jodi Kava, Esq.
>   Counsel for Jeffrey L. Sapir as Chapter 13 Trustee

**JAMES M. PECK**
**United States Bankruptcy Judge**

Franklin R. Jiminez (the "Debtor," "Jiminez" or "Plaintiff") brought this adversary proceeding seeking a determination that either (i) the lien on Plaintiff's property of the NYCTL 1996-1 Trust and The Bank of New York, as collateral agent and custodian for NYCTL 1996-1 Trust (the "Defendants"), has been rendered void because the Defendants' claim was "provided for" in Plaintiff's Amended chapter 13 Plan or (ii) the Defendants should be estopped from enforcing their lien and foreclosing on Plaintiff's property because the servicer for the NYCTL 1996-1 Trust mistakenly represented that the Defendants' claim was paid in full and did not realize the error for approximately twenty months.   In the alternative, Plaintiff requests that the Court reduce the allowable amount of interest on the Defendants' claim due to the negligence that contributed to this controversy.

Defendants maintain that their lien "ride[s] through" the Debtor's bankruptcy case because Plaintiff never paid the full amount of Defendants' claim.   Although the Amended Plan (defined below) included language that "provided for" Defendants' claim, the Court concludes that the lien retention clause in the Amended Plan was sufficient to preserve the Defendants' lien.  The Court further finds that the doctrine of equitable estoppel is inapplicable based on the facts of this case and declines to exercise its equitable power to reduce the interest rate to a rate less than the 9% rate proposed in

2

Debtor's Amended Plan. The interest applicable to the Defendants' secured claim will be based on a simple interest calculation and not compounded. Accordingly, the Court directs the Defendants to settle an order on Plaintiff and the chapter 13 trustee (the "Trustee") dismissing the complaint and entering judgment that includes a calculation of the principal amount of the secured claim that remains outstanding together with simple interest calculated in a manner consistent with this decision.

### *JURISDICTION AND VENUE*

This Court has subject matter jurisdiction under 28 U.S.C. §§1334(b) and 157(a) and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(F) and (H). Venue of this adversary proceeding is proper in this district under 28 U.S.C. §1409.

This Decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) and (c) of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### *FINDINGS OF FACT*

Prior to the petition date, the City of New York held a lien (the "Lien") on Jiminez's property located at 370 Willis Avenue, Bronx, New York (the "Property"). (4/19/07 Tr. 10:12-16). *See also* Proof of Claim #5 ("POC"). The Lien arose out of unpaid real property taxes, water and sewer charges and other property related charges. *See* POC. On May 21, 1996, the City assigned the Lien to the Bank of New York, as collateral agent and custodian for the NYCTL 1996-1 Trust (the "96 Trust"). *See* The City of New York Tax Lien Certificate attached to POC. J.E. Robert Co., Inc. ("JER")

was engaged by the 96 Trust as its agent and is responsible for servicing and collecting payments on the Lien. (9/15/07 Tr. 11:12-16, 13:2-6). *See also* POC. JER also provided servicing for other similarly constituted tax lien trusts.

On July 2, 1998, the Debtor filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code"). On August 31, 1998, the Defendants filed the POC seeking $43,228.08 plus "continuous" interest and legal fees.[1] According to the New York City Administrative Code, this claim under applicable nonbankruptcy law accrued interest at a rate of 18% per annum compounded daily. N.Y.C. Admin. Code §§ 11-224(g) and (f); 11-319(b)(6). On July 14, 1998, the Debtor filed a chapter 13 plan, which was amended on December 17, 1998 (the "Amended Plan"). The Amended Plan was a sixty-month plan that required the Debtor to pay one thousand eight hundred dollars ($1800.00) per month for the first five months and two thousand dollars ($2000.00) per month for the remaining fifty-five months. The Amended Plan provided that the:

> Holders of allowed secured claims shall retain the liens securing such claims and shall be paid, after payment in full of allowed priority claims, as follows:
> …
> NYCTL 1996-1 Trust and The Bank of New York to be paid 100% (one hundred percent) of its claim with 9% (nine percent) interest on the unpaid balance over the sixty (60) month duration of such payments.

Despite the five year term for payment and the modification of the interest rate applicable to the Lien, the Defendants did not object to the treatment set forth in the Amended Plan and did not oppose confirmation. The Amended Plan was confirmed by order entered on December 23, 1998.

---

[1] Attached to the POC is a statement that says "[f]oreclosure legal fees of approximately $2,107.00 have been billed as of this date, and are included in the amount set forth in the Proof of Claim. This amount could increase if new bills are received." To date, the Defendants have not sought additional legal fees.

4

Thereafter, the Trustee made regular distributions as prescribed by the Amended Plan including distributions with respect to the 96 Trust that were mailed to JER. JER corresponded with the Trustee and sent a letter dated October 31, 2000 from Dolores Britton of JER's Lien Servicing Department. *See* Plaintiff's Exhibit 1 and Defendants' Exhibit 7. This letter stated that JER had been paid in full for the tax lien and that JER was enclosing a check in the amount of $3,449.35 as a refund for the overpayment received by JER. *Id.* The letter included the following reference line:

> 02-02287-0007
> Jiminez, Franklin
> 991-31587

*Id.*

The reference line listed the block and lot number (the first line); the Property owner's name (the second line); and the DRL number, the internal account number (the third line). (9/15/07 Tr. 45:6-21). The DRL number starting with the numerals "99" indicated that the letter referred to the account for the NYCTL 1999-1 Trust and not the 96 Trust. *Id.* The enclosed check was drawn on the account of JER as servicer for the NYCTL 1999-1 Trust at the First Union National Bank. *See* Plaintiff's Exhibit 2. The Trustee did not notice that the funds being returned related to the NYCTL 1999-1 Trust or that the payment stub attached to the check referenced DRL number 991-31587-2105.

Jody Kava ("Ms. Kava"), an attorney from the Trustee's office who was personally involved in all aspects of the administration of Debtor's chapter 13 case, explained that she did not know that the Debtor owed money to the NYCTL 1999-1 Trust. (4/19/07 Tr. 22:2-6). She confirmed on the record that the Defendants' 96 Trust claim was the only tax trust claim that was being administered through the Debtor's bankruptcy. (4/19/07 Tr. 21:4-17). Therefore, when she received the refund check from

5

JER she did not question how it should be handled and assumed that the check related to the 96 Trust claim, the only claim that was being serviced by JER that had any connection to the Amended Plan. (4/19/07 Tr. 22:9-14). Ms. Kava pointed out that she focused on the 02-02287-007 number that was listed on the payment stub attached to the check. (4/19/07 Tr. 64:13-17, 65:1-7). This number, the block and lot number, was the same one that was listed on the Defendants' POC. *Id.*

Upon receiving the reimbursement check, Ms. Kava marked the Defendants' claim as withdrawn and distributed the proceeds of the check to the Debtor's other creditors.[2] (4/19/07 Tr. 62: 3-17). During the trial, Ms. Kava stated that it is the Trustee's routine practice to mark a creditor's proof of claim withdrawn upon receiving a refund from that creditor. (4/19/07 Tr. 62:24-25; 63:1-20). In total the Trustee sent JER approximately $34,563.20.[3] JER allocated approximately $29,432.10[4] of this amount

---

[2] The Court notes that Ms. Kava subsequently sent three checks to JER, after receiving the refund check and withdrawing the Defendants' 96 Trust claim. The first check for $998.18 was sent on November 10, 2000 and cashed by JER on November 15, 2000. The second check for $1,663.64 was sent on December 10, 2000. This check was not cashed and was returned to the Trustee. The third check was sent on January 10, 2001 and cashed by JER on January 18, 2001. (4/19/07 Tr. 67:11-14, 71:1-17). *See also,* Defendants' Exhibit 6 and Trustee's Master Report at p. 12.

[3] This figure is different from the $32,899.66 amount listed in the Final Report and Account. This is because the amount listed in the Final Report and Account did not include the $1,663.64 that was returned to the Trustee.

[4] The Trustee made the following payments that were applied by JER to Defendants' claim:

| Date sent by Trustee | Date credited by defendant | Amount |
|---|---|---|
| January 8, 1999 | January 13, 1999 | $5,415.34 |
| March 10, 1999 | March 25, 1999 | $1,970.12 |
| April 8, 1999 | April 16, 1999 | $1,000.93 |
| May 10, 1999 | May 20, 1999 | $1,000.95 |
| July 7, 1999 | July 21, 1999 | $1,000.94 |
| August 10, 1999 | August 18, 1999 | $1,260.93 |
| September 9, 1999 | September 20, 1999 | $1,891.39 |
| November 15, 1999 | December 7, 1999 | $1,891.40 |
| December 9, 1999 | December 17, 1999 | $2,521.86 |
| March 9, 2000 | March 21, 2000 | $3,782.79 |
| June 12, 2000 | July 7, 2000 | $1,260.93 |
| August 9, 2000 | August 15, 2000 | $1,513.11 |
| October 11, 2000 | October 17, 2000 | $1,486.51 |
| November 10, 2000 | November 15, 2000 | $998.18 |
| December 10, 2000 | Not credited by Defendants | $1,663.64 |
| January 10, 2001 | January 18, 2000 | $2,436.72 |

6

towards Defendants' proof of claim and approximately $5,131.20[5] towards obligations that Jimenez owed to the NYCTL 1999-1 Trust. The record does not explain what prompted JER to apply certain of the payments received from the Trustee to the NYCTL 1999-1 Trust. The most likely explanation is clerical error.

At trial, Salvan Ross III ("Ross"), the Vice President of Servicing at JER, testified to the process that occurs when a check is received by his office. Upon receipt, the check is photocopied, identified for application to a particular account and then sent by overnight delivery to the Bank of New York for processing through their lockbox. (9/15/07 Tr. 13:15-25; 1-5). Ross testified that it ordinarily takes approximately twenty-four to forty-eight hours from the time that a check is received to the time that it is processed. (9/15/07 Tr. 14:11). Check processing in this case appears to have taken longer at certain times resulting in the accrual of additional per diem interest.

### *PROCEDURAL BACKGROUND*

On December 19, 2001, the Court entered an Order Discharging the Debtor after completion of his Amended Plan. On March 26, 2002, the Debtor's chapter 13 case was closed. In August 2002, JER commenced foreclosure proceedings against the Debtor. (4/19/07 Tr. 10:12-16). On May 5, 2004, the Debtor's case was reopened, and on June 7, 2004, the Debtor commenced this adversary proceeding against the Defendants seeking a determination that (i) that the Lien has been discharged and is void or (ii) the Defendants are estopped from enforcing their Lien. Defendants filed an Answer to the Complaint denying that the doctrine of equitable estoppel applies and contending that the Lien

---

[5] This amount was computed by adding the $3,339.35 refund check plus the $1,663.64 check sent by the Trustee on December 10, 2000. Based on this calculation JER on behalf of NYCTL-1 1999 Trust kept approximately $18.21.

7

"ride[s] through" the Debtor's bankruptcy as an *in rem* claim against the Property unless and until it has been paid in full. The Court conducted evidentiary hearings on April 19, 2007 and September 15, 2007.[6] On January 25, 2008, Plaintiff filed a Post-Trial Brief, and on January 30, 2008, the Defendants filed Proposed Findings of Fact and Conclusions of Law. Thereafter, at Plaintiff's request, oral argument was held on April 9, 2008 (the "Closing Argument").

## ***DISCUSSION***

The material facts in this litigation are largely undisputed. Mistakes took place that led the Debtor to believe that the Lien had been satisfied. The parties disagree regarding the legal consequences of these mistakes made during the administration of Debtor's chapter 13 case. The question presented is whether the Debtor is entitled to any relief based upon these mistakes.

Although not specifically alleged in the Complaint and not proven during the trial, this litigation seeks what amounts to a deemed lien satisfaction as a proposed remedy for the negligence of JER as servicer of the 96 Trust. The requested remedy, voiding of or an equitable bar to enforcement of the Lien, is not available for the reasons described below.

Nonetheless, the accrual of interest on the Lien at a *per diem* rate of 18% would be both inequitable under the circumstances and inconsistent with the treatment set forth in the Amended Plan. For these reasons, the Court has limited interest to simple interest, computed annually, on the outstanding balance of the Lien as of October 31, 2000, the date that JER sent its letter to the Trustee. This letter from JER precipitated the various

---

[6] The long delay between the two hearing dates was due to ongoing settlement discussions that ultimately failed to produce a signed settlement agreement.

8

misunderstandings relating to the validity and enforceability of the Lien that, in combination, are at the root of this litigation.

Although the Court finds no support for the proposition that the Lien should be extinguished, the amount of the Lien does need to be adjusted downward substantially to remove excessive accruals of *per diem* interest that have been claimed by the Defendants. In order to accomplish this adjustment, the Court has determined that the principal amount of the Lien should be fixed as of the date of the letter from JER as further reduced by those payments credited to the account after that date. This approach balances the rights of the Defendants to retain the value of their *in rem* Lien and receive compensation for delay and the rights of the Debtor to eliminate the burdensome accumulation of *per diem* interest.

### A. THE LIEN REMAINS VALID AND IS PRESERVED UNDER THE PLAIN LANGUAGE OF THE AMENDED PLAN

Plaintiff argues that the Lien is void because the Defendants' claim was administered through the Debtor's estate. The Defendants' claim that the Lien passed through the bankruptcy unaffected and that the discharge extinguished only the *in personam* claim against the Debtor, but had no effect on their *in rem* claim against the Property. "However, like most generalizations about law, the principle that liens pass through bankruptcy unaffected cannot be taken literally" in a chapter 13 case. *In re Bryant,* 323 B.R. 635,645 (Bankr. E.D.Pa. 2005) n 13, citing *In re Penrod*, 50 F.3d 459,462-63 (7th Cir. 1995)(internal citations omitted).

Section 1327(b) of the Bankruptcy Code provides that all property of the estate is vested in the chapter 13 debtor upon entry of the order of confirmation, unless the plan

or order confirming it provides otherwise.[7]   Section 1327(c) deems all property vesting in the debtor at confirmation by virtue of section 1327(b) "free and clear of any claim or interest of any creditor provided for by the plan," except as otherwise provided in the plan or the order confirming the plan.   Since a "lien" is a "claim" in a chapter 13 case, whether a secured creditor's lien rights survive confirmation depends upon whether the chapter 13 plan provides for the lien. *See Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150 (1991); *In re Bryant*, 323 B.R. at 644-45.   Further, the survival of lien rights depends on whether the chapter 13 plan contains a provision allowing the holder to retain its lien after confirmation.

The term "provided for" is not defined in the Bankruptcy Code.   In *Lawrence Tractor Co. v. Gregory,* the Court held that to "provide for" a claim a plan need only "make a provision for it, i.e., deal with it or refer to it." 705 F.2d 1118,1122 (9th Cir. 1983).   The Supreme Court in *Rake v. Wade* subsequently adopted this broad definition. 508 U.S. 464, 474-75, 113 S.Ct. 2187 (1993).

The Defendants argue that despite the language in §1327 secured claims that are provided for in a chapter 13 plan are not extinguished upon confirmation of the plan if the plan does not satisfy such claims.   The Defendants cite to *In re Scott*, 295 B.R. 686 (Bankr.M.D.Ga. 2003) and *In re Hetfield*, 1983 WL 2178 (Bankr.N.D.N.Y., October 3, 1998) to support their argument.   The Court recognizes that some courts have found exceptions to § 1327 of the Bankruptcy Code.  8 Collier on Bankruptcy ¶1327.02[1][c]-[2] (15th ed. rev. 2007).   However, these exceptions are limited to cases where a debtor's confirmed chapter 13 plan significantly alters a claim filed by a secured creditor or where

---

[7]  11 U.S.C. §1327(b) provides "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all the property of the estate in the debtor."

10

a debtor's confirmed plan eliminates a secured creditor's lien when that secured creditor has chosen not to file a proof of claim. *See Id.*

The Court in *In re Scott*, decided that a junior mortgagee's secured claim survived a debtor's chapter 13 plan. In that case, the junior mortgagee had filed a secured proof of claim for $11,543.13. Rather than objecting to the junior secured claim, the debtor attempted to eliminate the claim by providing in his chapter 13 plan that the holder of the junior mortgage was not entitled to any distribution. This tactic did not work. The Court stated that the junior mortgagee retained his rights under the second mortgage until his secured claim was satisfied in full. Similarly in *In re Hetfield*, the Court found that a secured creditor's lien survived the chapter 13 plan when the plan impermissibly treated a secured creditor as an unsecured creditor.

Here, the Amended Plan recognized the Lien and, except for cutting the interest rate, did not materially alter the treatment of the claim contemplated by the POC filed by the Defendants. The POC stated that the Debtor owed $43,228.08 "plus continuous interest hereinafter." The Amended Plan expressly provided for the Defendants' claim and specified an interest rate for that claim. The Amended Plan stated that "NYCTL 1996-1 Trust and The Bank of New York to be paid 100% (one hundred percent) of its claim with 9% (nine percent) interest on the unpaid balance over the sixty (60) month duration of such payments." Thus, upon confirmation the Amended Plan explicitly defined the rights of the Defendants with respect to the secured claim.

The Amended Plan also included a lien retention clause. The Amended Plan provided that "[h]olders of allowed secured claims shall retain the liens securing such claims and shall be paid, after payment in full of all allowed priority claims." As a

11

consequence of this provision, the Defendants retained their lien post confirmation to the extent that their claim was not paid in full.  *See In re Bryant,* 323 B.R. at 645; *In re Echevarria,* 212 B.R. 26,27 (Bankr. D.P.R. 1997).

Despite the plain language of the Amended Plan expressing the intent of the Debtor to pay the secured claim of the Defendants in full, Jimenez is attempting now to exploit an error by JER as servicer that led the Trustee to come to a reasonable but incorrect inference – that the Lien had been satisfied.  The fact that some of the payments made pursuant to the Amended Plan were improperly applied to another lien on the Property does not excuse the failure to pay the Lien as provided in the Amended Plan nor does it wipe out the Lien.   Payments made by the Debtor under the terms of his confirmed Amended Plan were applied to the claims of his creditors, and he is not entitled now to any windfall.[8]

### B. THE APPLICABLE INTEREST RATE IS 9%

The Amended Plan also prescribed a 9% interest rate rather than the 18% statutory rate specified under the New York City Administrative Code.  The order confirming a chapter 13 plan represents a binding determination of the rights and liabilities of the parties as provided by the chapter 13 plan. Absent affirmative action at or prior to the confirmation hearing, the confirmed plan is *res judicata* and its terms are

---

[8] The Court is mindful that the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") added new language to section 1325(a)(5)(B).  This section, as amended, requires a debtor to include a lien retention clause within the debtor's chapter 13 plan that protects the debtor's secured creditors who have not affirmatively accepted the plan.  However, the holder of the secured claim only retains this lien until the earliest to occur of the following three events: (1) payment of the debt under non-bankruptcy law; (2) discharge under 11 U.S.C. § 1328; or (3) dismissal or conversion of the case without complete payment.  11 U.S.C. §1325(a)(5)(B)(I)(aa),(bb),(cc).  While this language could have been an obstacle for the Defendants because the Debtor both received a discharge and his case was dismissed before being reopened for purposes of pursuing this litigation, the Court does not need to consider the impact of this language because Debtor's case was filed prior to the effective date of the BAPCPA amendments.

12

not subject to collateral attack.  *See In re Harvey*, 213 F.3d 318 (7th Cir. 2000); *Anderson v. UNIPAC-NEBHELP*, 179 F.3d 1253 (10th Cir. 1999); *Multnomah County v. Ivory*, 70 F.3d 73 (9th Cir.1995); *In re Szostek*, 886 F.2d 1405 (3d Cir. 1989).  *See also* 8 Collier on Bankruptcy § 1327.02[1] (15th ed. rev. 2007).  Secured creditors whose claims are being treated in a chapter 13 plan must object to the plan if they believe it to be improper in any respect affecting their treatment.

Here, the Defendants waived their right to seek the 18% statutory interest rate by not objecting at confirmation to their treatment under the Amended Plan.  In *Western Thrift & Loan Association v. Blair*, 21 B.R. 316 (Bankr. S.D.Cal.1982), a case with facts similar to those presented here, a secured creditor sought a determination that it was entitled to the contract rate of interest.  The debtors' confirmed plan provided for interest at the rate of 10% per annum, a rate considerably less than the contract rate.  The Court held that the secured creditor was bound by the 10% provision because the secured creditor failed to object to the plan at confirmation. *See e.g. In re Echevarria,* 212 B.R. at 28 (court held that an oversecured creditor could not seek to add interest to its claim after confirmation because debtor's plan did not provide for interest); *In re Szostek,* 886 F.2d at 1412-1414 (court held that a secured creditor's failure to assert a timely objection to a plan that did not provide for payment of the present value of its claim as required by §1325(a)(5)(B)(ii) precluded the secured creditor from attempting to vacate confirmation); *In re Hebert*, 61 B.R. 44, 46-47 (Bankr. W.D.La. 1986)(court held that failure by the IRS to object to its treatment under the chapter 13 plan precluded the IRS from seeking to enforce its lien for interest following confirmation).

13

Accordingly, the confirmed Amended Plan that binds the Debtor in relation to the preservation of the Lien also binds the Defendants as to the applicable interest rate. By virtue of not objecting to their treatment at confirmation, both the Debtor as proponent of the Amended Plan and the Defendants are bound by the 9% interest rate provided in the Amended Plan.

### C.  THE DOCTRINE OF EQUITABLE ESTOPPEL DOES NOT APPLY

Plaintiff also contends that even if the Court finds that the Lien is valid, the Defendants should be barred from foreclosing on the Property based on the doctrine of equitable estoppel. The doctrine of equitable estoppel is grounded in notions of fair dealing and good conscience and should be applied "where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.,* 274 F.3d 706,725 (2d Cir. 2001).  *See also, In re Ionosphere Clubs, Inc.*, 85 F.3d 992,999 (2d Cir. 1996).

Equitable estoppel requires finding three essential elements (1) the party to be estopped must make a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) the other party reasonably relies upon the representation to its detriment; and (3) the party to be estopped had knowledge, actual or constructive, of the true facts. *Kosakow,* 274 F.3d at 725; *International Minerals & Res., S.A. v. Pappas,* 96 F.3d 586,694 (2d Cir. 1996). The purpose of the doctrine "is to prevent a [party] from, in effect, trying to have its cake and eat it too." *Birmingham Associates Ltd. v. Abbott Laboratories*, 2008 WL 1733272, *4 (S.D.N.Y. April 14, 2008)(internal citations and quotations omitted).

14

Given these requirements, Plaintiff's equitable estoppel argument is not at all compelling. Plaintiff has neither alleged nor proven that the Defendants made a calculated misrepresentation. Instead, the record demonstrates that both JER and the chapter 13 trustee were not communicating clearly with each other, and this breakdown in communication produced a basic misunderstanding on the issue of whether the Lien had been satisfied or remained outstanding. JER made a mistake by writing to the trustee about a lien that was not being treated under the Amended Plan, but JER does not appear to have done this deliberately or for the purpose of inducing any detrimental reliance.

What happened is regrettable but not actionable. Certain payments made by the chapter 13 trustee were applied in error to another tax lien trust account relating to Debtor's Property. This misapplication resulted in the satisfaction of another lien against the Property, the return to the chapter 13 trustee of what purported to be an overpayment, and the redistribution of these returned funds to other creditors. Ms. Kava believed that the Lien had been satisfied and that the secured POC should be deemed withdrawn. Given what Ms. Kava knew at the time, her inferences regarding the Lien were incorrect but not unreasonable.

While these mistaken inferences as to the validity of the Lien have created the opportunity for litigation, they do not establish any grounds for the Debtor's alleged detrimental reliance on any representation. All that JER did was to apply payments and return an apparent over-payment to the chapter 13 trustee who then treated the Lien as having been fully paid. JER did not deal directly with the Debtor on the subject and made no representation to the Debtor. Importantly, the Debtor has not been damaged by any of this sloppy claim administration.

The undeniable point is that the Lien that the Debtor had intended to pay in full under the Amended Plan was not fully paid and continues as a recorded lien against the Property. There is nothing inequitable about such an outcome. The cases cited by the Plaintiff for the proposition that equitable estoppel should apply are not even remotely relevant to the circumstances of this case and have no bearing here.[9]

### D. CAUSE DOES NOT EXIST TO SELECT AN INTEREST RATE LESS THAN 9%, AND INTEREST SHOULD ACCRUE WITHOUT COMPOUNDING

This adversary proceeding has been unduly delayed for a variety of reasons, mostly attributable to Plaintiff. This litigation was commenced almost four years ago in June 2004. Since then the Plaintiff has retained three separate attorneys to represent him. Delay was caused each time that a lawyer was terminated and each time that new counsel was retained. Also, four months passed between the two trial days in this case while the parties were engaged in settlement discussions. Counsel advised that a settlement had been reached and was being documented. At some point towards the end of this period, Plaintiff decided not to proceed with the settlement.

It is unfortunate that time was wasted between the two trial dates. The Court also recognizes that the Defendants' counsel who asked for an extended briefing schedule for medical reasons caused some of the delay in recent months. From the Debtor's perspective, one of the extremely negative consequences of the long delay in bringing this matter to a resolution is that interest has continued to accrue at an alarming rate with respect to the Lien. Defendants' calculations of the claim are based on a *per diem* rate of

---

[9] For example, one of the cases cited by the Plaintiff is *Holmes v. Lorch*, 329 F.Supp.2d 516 (S.D.N.Y.2004), in which the defendants contended that some of the plaintiff's causes of action were barred by the applicable statute of limitations, and plaintiff sought to bar the defense alleging that defendants made representations that caused the plaintiff to delay bringing suit.

16

eighteen percent. For reasons previously noted, that rate produces a disproportionately large claim, is no longer an available option given the terms of the Amended Plan and is rejected by the Court for purposes of fixing the Lien claim. However, the Debtor has not provided any rational basis to select any rate other than the 9% rate set forth in the Amended Plan.

A question does exist as to the method for computing interest on the Lien. The Amended Plan is silent with respect to whether interest should be calculated as simple interest or whether it should be compounded. The "objective of contract interpretation is to give effect to the expressed intention of the parties." *Record Club of America, Inc. v. United Artists Records, Inc.*, 890 F.2d 1264,1271 (2d Cir. 1989). Here, the Debtor has not expressed any clear intent on the question of the accrual of interest, although it is doubtful that Debtor intended for interest to be compounded inasmuch as the Amended Plan provided 9% interest to all of the Debtor's allowed secured creditors.

The trial record supports the proposition that the Amended Plan proposed a simple interest calculation. During the trial, Ms. Kava noted that the Trustee had planned on paying the Defendants approximately $56,465.00 which included approximately $13,236.92 in interest. (4/19/07 Tr. 73:1-7). This interest amount was calculated based on a 9% simple interest rate over a term of sixty months. She explained that the Trustee could never administer a chapter 13 plan where interest on one of the claims would be compounded daily because debtors often do not make payments on time. (4/19/07 Tr. 75:18-25; 76:1).

Reference to the judgment rate of interest used in the New York State Courts is also helpful. New York Civil Practice Law and Rules ("NYCPLR") (McKinney 2007) §

5004 states that "[i]nterest shall be at the rate of nine per centum per annum" with no compounding of interest. Simple interest is, thus, consistent with practice under state law. Additionally, requiring the Debtor to pay compound interest on the principal amount still due, calculated annually or daily, would not be in the interests of justice, particularly in light of the delays that have prolonged the process of adjudicating this dispute.

Moreover, the Court needs to consider principles of equity and fairness in determining the amount of the Lien, together with accrued interest, after so many years of litigation. *See In re Urban Communicators PCS Ltd. Partnership*, 379 B.R. 232 (Bankr. S.D.N.Y. 2007)(Court made an equitable determination to depart from the contract rate of interest which, with compounding, yielded an excessive amount of interest, and decided to limit the accrual of interest to a rate not to exceed the 25% interest rate set forth under New York's criminal usury statute).

### *CONCLUSION*

For the reasons stated, the lien retention clause in the Amended Plan preserved the Lien, the doctrine of equitable estoppel is inapplicable and the interest rate in the Amended Plan should be applied in determining the amount of the Lien against the Property as of the date of entering judgment.

Subject to the findings and conclusions of this decision, the Court finds in favor of the Defendants and directs the Defendants to settle an order on Plaintiff and the Trustee providing for judgment in favor of the Defendants. The order shall include a determination of the amount of the Lien based on a 9% simple interest rate calculation

with interest to accrue from October 31, 2000 on the principal amount that was outstanding on that date after crediting all payments made after that date.

    IT IS SO ORDERED.

Dated: New York, New York
      May 9, 2008

                                      *s/ James M. Peck*
                                    HONORABLE JAMES M. PECK
                                    UNITED STATES BANKRUPTCY JUDGE